IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHRISTIANA SUNSHINE LONGWAY, and BUENEAVENTURA RIVERA | : | |
| | : | |
| Plaintiffs | : | No.:   CV |
| v. | : | |
| | : | |
| THE SOCIETY FOR CREATIVE ANACHRONISM, INC., a/k/a/ "SCA" or "SCA, Inc.", | : : : | JURY TRIAL DEMANDED |
| Defendant | : | |

## PLAINTIFFS' CIVIL ACTION COMPLAINT

PARTIES, JURISDICTION & VENUE

1. Plaintiff is Christiana Sunshine-Longway, a citizen and resident of the State of New York, with an address of 543 Ashford avenue, Ardsley, Westchester County.

2. Plaintiff is Buenaventura Rivera ("Ben Rivera"), a citizen and resident of the State of New York with an address of 700 Scarsdale Avenue, Apartment 3F, Scarsdale, Westchester County.

3. Defendant, Society for Creative Anachronism, Inc. (hereinafter referred to as the "SCA", "SCA, Inc."), is a foreign corporation or other organized business entity which, upon information and belief, maintains multiple offices in the State of New York and which maintains its worldwide headquarters and/or principal place of business in Milpitas, California, having a mailing address located at P.O. Box 360789, Milpitas, CA 95036-0789.

4. Defendant the Society for Creative Anachronism regularly conducts business within New York, within the Southern District of New York and specifically within Westchester County.

5. Among numerous other business activities, the SCA operates, in

New York, the "Kingdom of Ostgardr" also known as the East Kingdom which has served and serves its numerous members in and around New York since 1968 and otherwise services the greater New York area, its members and participants.

6.  This action is brought by Plaintiffs to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. Section 1332 (a)(1) in that the amount in controversy exceeds the amount and/or value of $75,000.00 exclusive of the interest and costs and the action currently is between citizens of different states.

7.  At the time of filing, venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a)(2) in that a substantial part of the events giving rise to the claim occurred in this judicial district.

8.  The Society for Creative Anachronism, Inc. (hereafter "SCA"), represents that it is an international "non-profit volunteer educational organization. The SCA is devoted to the research and re-creation of pre-seventeenth century skills, arts, combat, culture, and employing knowledge of history to enrich the lives of participants through events, demonstrations, and other educational presentations and activities."

9.  The SCA has further represented that it "is divided into twenty regions called kingdoms. Each kingdom is ruled by a pair of monarchs who have competed in a Crown Tournament to win the throne. Kingdoms contain local chapters known as Cantons, Shires, and Baronies. The members of these local chapters are the ones who actually plan and run all the events, practices, and other activities for SCA participants."

10. The SCA has over 30,000 members residing in countries around the world.

11. The SCA was founded May 1, 1966 in Berkeley, California by a small group of people.

12. In 1968, the SCA spread to the eastern United States and started the "East Kingdom".  By the 1970's the SCA had established four "kingdoms" in the United States

which are still in existence today.

13. While a person can become a formal member of the SCA, membership is not required to participate in SCA activities or events. Administrative functions, including management of memberships throughout the SCA is performed by SCA employees and/or volunteers at its Milpitas, California headquarters.

14. The SCA is run by the Board of Directors who have ultimate authority concerning the interpretation of the SCA's by-laws, rules and policies. The Board of Directors can dissolve any subgroup within the SCA and sanction and expel members.

15. The head administrative agent of the SCA is the Society Seneschal. "The Society Seneschal is responsible for coordinating the administration of the Society's historical recreation. This involves directing the activities of the Kingdom Seneschals and of Society-level deputies. Where questions arise concerning the intent of the [Society's laws and policies], the Board specifically authorizes the Society Seneschal to make interpretations and clarifications...the Society Seneschal is also responsible for reviewing all sanction related activities."

16. Each kingdom has as its ruling authority a crown and a seneschal.

17. The crown of a kingdom can create and amend the laws of their kingdom as they deem necessary. They can appoint officers of the kingdom and hold courts to administer the kingdom.

18. The seneschal of a kingdom "is the chief administrative officer of the Society for the kingdom, which includes coordinating the other kingdom officers as required for the smooth operation of the kingdom and for its relations with outside agencies. The Seneschal is responsible for assisting new branches and for branch elevations."

19. Plaintiffs Sunshine-Longway and Rivera are members of the SCA and were active in a subchapter of the SCA and the East Kingdom known as the Canton of Northpass

("Northpass").

20. Northpass had over 44 paid members and twenty unpaid members. It ran 4-6 ran 4-6 successful events per year, had regular monthly meetings with 20-30 persons in attendance, typically had between 6 and 10 thousand dollars in its bank account, ran multiple weekly and monthly meetings for archery, fencing, A&S, games, general planning, and other activities.

21. Northpass was considered a successful canton and had initiated the process for consideration to elevate its status within the East Kingdom to barony or shire status.

22. SCA Northpass meetings took place in the homes of its members. On Tuesday, April 10, 2018, an SCA Northpass meeting was held at the home of Christiana Sunshine Longway, her husband Cameron and their child, Jenna. There were twenty people in attendance, including a deputy canton officer, Lettie Harris.

23. Lettie Harris ("Lettie") expressed to Ben Rivera, the Chancellor of the Exchequer for Northpass, that they thought the meeting space was unkempt, and asked Mr. Rivera to contact child protective services ("CPS") in this regard. Mr. Rivera assured Lettie that the space was entirely within norms. Lettie expressed that they considered the conditions unsafe and would either be contacting mundane child welfare authorities or would be asking other people to do so in their stead.

24. Mr. Rivera observed Lettie engage in a series of texts with an unknown third party while stating that they would have this third party handle this situation for them. Mr. Rivera advised Lettie that the space was within society norms, and looked reasonably safe, and that as a father of two (now grown) children he asked Lettie to reconsider calling Child Protective Services. Lettie seemed Mr. Rivera to reluctantly agree.

25. Child Protective Services ("CPS"), however, knocked on the door of the Sunshine-Longway house, where the meeting had taken place, at 9 pm the next day, but did not make contact with the Sunshine-Longways. The second morning after the meeting CPS

made contact with the Sunshine-Longways and inspected their house.

26.     During the investigation, CPS forced the Sunshine Longways to unnecessarily update and renovate their home, forcing the Sunshine-Longways separate. The home essentially became a construction zone.  Christiana Sunshine-Longway moved out of the home and lived separate to Cameron to protect Jenna from the dangers attendant to a construction zone while Cameron supervised the renovations. CPS also forced the family to undergo unnecessary counseling and evaluation while threatening to take away Jenna from them. The result of the investigation, however, was that the accusations that brought CPS to the Sunshine-Longways were unfounded.

27.     The investigation caused the Sunshine-Longways economic hardship due to multiple weeks of work missed and the additional renovation expenses incurred to further update their home.

28.     The economic hardship that the Sunshine-Longways suffered was insignificant compared to the emotional harm which manifested physically and psychologically in the Post-Traumatic Stress Disorder suffered by all members of the family, which required and still requires mental health counseling.

29.     During a meeting of the East Kingdom to discuss the false report of child neglect and/or child abuse made to CPS targeting the Sunshine-Longways, Lettie acknowledged knowing who had filed the complaint against Christiana, and that she had an extreme dislike of Christiana Sunshine-Longway that, it became clear, was rooted in jealousy, fear and envy. Lettie admitted to applying for and taking multiple offices within Northpass with the intent of shutting Christiana out of them. On information and belief, the false report of child abuse/neglect was made by Lettie or at Lettie's direction as an agent of the SCA.

30.     At an SCA Brew-U event a few weeks later, while representing the SCA, Lettie continued to slander and defame Christiana.  Among other things, Lettie stated that

Christiana was a bully, a liar, a backstabber and an unfit mother and that there was a group within the East Kingdom SCA that was targeting Christiana and the Sunshine-Longways for harassment and/or physical harm. The Seneschal for Northpass asked her to desist from these activities. Lettie then resigned from all positions in Northpass, made an informal complaint to the East Kingdom that the Seneschal for Northpass had treated her unfairly, and applied to become an officer of the East Kingdom.

31. Christiana Sunshine-Longway filed a complaint with the East Kingdom claiming harassment by Lettie and asking the East Kingdom to investigate Lettie's claim that there was a group within the SCA that was targeting her family.

32. Despite the complaint, the East Kingdom Seneschal, appointed Lettie to several important offices including as the East Kingdom Diversity Officer. While the complaint was investigated, the East Kingdom promoted Lettie within the kingdom and provided her with the ability to continue her harassment and defamation of Christiana. The investigation into the complaint by Christiana against Lettie was closed in contravention of East Kingdom and SCA by-Laws, to include, for example, by failing to contact any witnesses. Lettie continued to be promoted throughout the year by the East Kingdom Seneschal.

33. Shortly thereafter, Northpass was administratively suspended when the East Kingdom Seneschal removed the Northpass Seneschal from office in contravention of the by-laws, without a formal complaint being filed against him, without an investigation, without notice and via social media. The East Kingdom kept Northpass punitively suspended from the end of May to mid-July without explanation, in contravention of East Kingdom and SCA by-laws.

34. Christiana and other officers contacted the East Kingdom officers to find out what led to Northpasses' suspension. The East Kingdom ignored their inquiries, stating that it could not be discussed. Northpass Officers, to include Plaintiffs filed a formal

complaint concerning the suspension and removal of the Northpass Seneschal as per the by-laws with the SCA Seneschal, which was reviewed by the East Kingdom Seneschal.

35. The East Kingdom Seneschal forced a series of meetings attended by the East Kingdom Crown, where there were approximately one hundred SCA members present, where the Crown stated that more light needed to be shone on Northpass to reveal where the cockroaches were hiding, and accused Northpass members, many of whom are part of the LGBTQ community of not being friendly to the LGBTQ community.

36. The East Kingdom Crown presided over a meeting to elect a new Northpass Seneschal, but forced Northpass to follow a process outlined by the East Kingdom Seneschal, not Northpasses' by-laws, in contravention of SCA by-laws. Christiana Sunshine-Longway was elected Northpass Seneschal.

37. Christiana ran the canton successfully for a time. She filed several valid complaints with the East Kingdom Seneschal and crown, which were ignored. She sent certified copies of the complaints to the East Kingdom Crown and Seneschal, as per SCA law, but the complaints were refused delivery by the recipients. Also, throughout this time, Lettie was promoted by the East Kingdom through several important offices.

38. As a result, Christiana was unable to remain in office, due to her treatment by the SCA, its officers, and the continued trauma and PTSD resulting from the child welfare case, the failed East Kingdom investigation of her complaints and the fear that there was a group of people targeting her family.

39. When Christiana stepped down, Northpass voted to instate a new seneschal of their choice as per their by-laws and SCA Law. However, the East Kingdom Seneschal proposed their own Northpass Seneschal. The newly elected Northpass Seneschal was told to stand down by the East Kingdom Seneschal, and essentially told that if they did not accept the East Kingdom Seneschal's choice for Northpass Seneschal, they would be suspended.  This process is in contravention of SCA by-laws.

40. Northpass officers were forced to elect the East Kingdom Seneschal. Within two meetings at Northpass, the new East Kingdom approved Northpass Seneschal stated his intent to "burn down the bylaws," and "run the canton as a dictator," in contravention of SCA by-laws. The officers of Northpass, to include Ben Rivera, planned to hold a no-confidence vote to remove the Northpass Seneschal.

41. During this time, the East Kingdom seneschal's office had passed from the prior holder, Katherine Barr, to her protégé, Kellie Donovan. Ben Rivera emailed Kellie Donovan a description of current circumstances, and the intent to remove the seneschal. Kellie Donovan then suspended the canton and sanctioned all officers from holding office within the East kingdom, for the period of a year, in contravention of SCA by-laws, citing the officers' behavior and Christiana's stepping down as Northpass Seneschal as hostile acts towards the East Kingdom.

42. Upon the expiration of that year time period, the East Kingdom Seneschal then announced via provincial email list that she was making a recommendation to the Board of Directors to dissolve the canton, based on unspecified issues among the officers of Northpass and her discovery that the Northpass bank accounts had not been properly transitioned.

43. However, the East Kingdom Seneschal had been publicly informed by Ben Rivera that the canton was still waiting on the kingdom exchequer to complete the forms required to properly change the canton officers listed on the bank account, which by East Kingdom law must be forwarded to the SCA by the kingdom exchequer.

44. The Board of Directors then voted to dissolve the Northpass Canton, without an investigation or due process, in contravention of SCA by-laws and policies.

45. As a result, the SCA owes a duty of reasonable care to its members which plaintiff Christiana asserts was negligently or recklessly breached leading to her injuries. Because of the nature of the organization and based upon its assumed duties,

Defendant SCA owes a duty of reasonable care to its membersand non-member participants in its activities and functions.

46. The SCA has, through its history, policies and procedures negligently and/or recklessly breached this duty.

47. Plaintiff Christiana Rivera brings this action for physical, mental and emotional damage caused to her between 2018 to today by the Defendant SCA, as a result of Defendant's negligence and/or reckless acts.

48. Defendant SCA knew or should have known of Lettie's targeted harassment, to include the false report of child abuse/neglect targeting Christiana Sunshine Longway.

49. The SCA's acts of negligence and/or recklessness which led to Plaintiff's injuries and harm occurred from its inception in 1966 through 2021.

50. Instead of taking any reasonable steps and exercising due care to protect Plaintiff Christiana Sunshine-Longway from harassment and abuse, the SCA adopted a "head in the sand" attitude to negligently and/or recklessly ignore the known problems described above.

51. The SCA negligently failed to implement, enforce and/or follow protective measures including enforcing its own policies and procedures against bullying and harassment.

52. Plaintiffs Christiana Sunshine-Longway and Ben Rivera bring this action for injunctive relief in that they were further harmed by the dissolution of the Northpass Canton and their suspension from holding office within the SCA by the SCA Board of Directors through a process that was in contravention to the SCA by-laws and polices and violated New York Non-Profit Corporations Law.

**COUNT I – NEGLIGENCE (PLAINTIFF CHRISTIANA SUNSHINE-LONGWAY)**

53. Plaintiff incorporates herein by reference all the above allegations

contained in paragraphs 1 through 52 and throughout this entire complaint as though same were fully set forth herein at length.

54. The defendant was negligent and/or reckless including but not limited to, *inter alia*, the following:

    a. negligently failing to adopt, enforce and/or follow adequate policies and procedures for the protection from harassment, defamation, slander, bullying and false allegations of child abuse/neglect at SCA related activities and/or events, of its members including plaintiff and, in the alternative, failing to implement and comply with such procedures which had been adopted;

    b. failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of members from harassment, defamation, slander, bullying and false allegations of child abuse/neglect;

    c. negligently failing to adopt, enforce and/or follow policies and procedures to protect its members;

    d. negligently failing to provide plaintiff with any assistance in coping with the injuries sustained;

    e. violating its own policies and/or by-laws regarding revocation/denial of membership;

    f. negligently selecting and/or training SCA members, including Lettie Harris and officers within the SCA;

    g. failing to adopt, implement and/or enforce policies and procedures for the reporting to SCA authorities and/or other authorities harassment, bullying, defamation, slander and false reports of child abuse/neglect;

55. As a proximate and direct result of Defendant's negligence and/or reckless conduct described herein, Plaintiff was harmed as a result and has sustained emotional injuries, mental anguish, pain and loss of enjoyment of life and life's pleasures;

56. Plaintiff has been and will likely, into the future, be caused to incur medical expenses and may likely incur a loss of earning capacity in the future;

57. Defendant SCA knew or should have known about the severe risk of their failure to take any appropriate precautions outlined above and acted in a reckless disregard to such risk for which plaintiff is entitled to and hereby seeks punitive damages pursuant to the requirements of New York law.

58. Defendant SCA's actions and failures described herein are outrageous and were done recklessly with a conscious disregard of the risk of harm to Plaintiff and her rights or on other grounds for which plaintiff is entitled to and hereby seeks punitive damages in every count of this complaint.

WHEREFORE, Plaintiff claims of Defendant, The Society for Creative Anachronism, Inc., damages in excess of $75,000 together with costs, interest, punitive damages and attorneys fees as permitted by law.

## COUNT II - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (PLAINTIFF CHRISTIANA SUNSHINE-LONGWAY)

59. Plaintiff incorporates herein by reference all the allegations contained in paragraphs 1 through 57 and throughout this entire complaint as though same were fully set forth herein at length.

60. Defendant had a duty to plaintiff to ensure plaintiff was not harassed, defamed, slandered, put in fear of her families' safety or have a false report of child abuse/neglect filed against her.

61. Defendant by and through its contact with plaintiff, as described above, negligently and/or recklessly committed multiple acts of extreme and outrageous conduct which caused severe emotional distress to plaintiff as described more fully above in an extreme, outrageous and harmful manner.

62. Defendant negligently breached the trust to plaintiff leading to his damages and injuries.

WHEREFORE, Plaintiff claims of Defendant, The Society for Creative Anachronism, Inc., damages in excess $75,000 limit together with costs, interest, punitive damages and attorneys fees as permitted by law.

### COUNT III – INJUNCTIVE RELIEF (PLAINTIFFS' RIVERA AND SUNSHINE-LONGWAY)

63. Plaintiff incorporates herein by reference all the allegations contained in paragraphs 1 through 62 and throughout this entire complaint as though same were fully set forth herein at length.

64. Defendants had no right to dissolve the Canton of Northpass and suspend Plaintiffs from holding office within the SCA in violation of its own by-laws, laws and policies.

65. That the decision of the Board of Directors to dissolve the Canton of Northpass and Suspend Plaintiffs from holding office within the SCA was a violation of New York Non-Profit Corporations Law.

66. As described above, the Plaintiffs' enjoyment of their membership in the SCA and their rights as members have been adversely affected by the Defendant's violation of the SCA's by-laws, rules and policies.

67. Simple damages cannot restore the Plaintiffs to their status prior to the adverse actions of the SCA.

68. Irreparable harm will occur to Plaintiffs if the Northpass Canton remains dissolved and the officers are unable to hold office in that their rights as members of the SCA will continue to be violated and they will continue to be unable to benefit from their membership with the SCA.

69. The Plaintiffs will be successful on the merits of the case, in that the SCA

has caused harm through violating its own policies and by-laws.

70. The Plaintiffs will be successful on the merits of the case, in that the SCA has caused harm through violating New York Non-Profit Corporations Law.

71. Lastly, the benefits to the Plaintiffs in the restoration of Northpass and the restoration of their rights to hold office within the SCA outweigh the burdens to the SCA in allowing Northpass to remain dissolved and violating the Plaintiffs' rights as members.

WHEREFORE, Plaintiffs request that the Court order the SCA to reinstate Northpass as a Canton of the East Kingdom, returning it to its former status and by-laws, and reinstate the Canton assets and moneys, and to allow the former officers, to include plaintiffs, to hold office within the Canton and the SCA.

By Plaintiffs,

  /s/ Buenaventura Rivera_____

BUENAVENTURA RIVERA (PRO SE)

700 Scarsdale Avenue, Apartment 3F,
Scarsdale, New York 10583
(914) 563-6009
Ben.rivera@systemsllc.com



  /s/ Christiana Sunshine-Longway_____

CHRISTIANA SUNSHINE-LONGWAY (PRO SE)

543 Ashford Avenue,
Ardsley, New York 10502
914-3145066
clsunshinelongway@gmail.com